**HALE COUNTY, ALABAMA et al., Plaintiffs,**

v.

**UNITED STATES of America et al., Defendants.**

Civ. A. No. 77–0286.

United States District Court, District of Columbia.

Sept. 4, 1980.

W. McLean Pitts, Pitts & Thompson, Selma, Ala., Cartledge W. Blackwell, Jr., Gayle & Blackwell, Selma, Timothy Sullivan, Washington, D. C., for plaintiffs.

S. Michael Scadron, Robert S. Berman, U. S. Dept. of Justice, Civil Rights Division, Washington, D. C., for defendants.

Before EDWARD A. TAMM, Circuit Judge, JOHN LEWIS SMITH, Jr., District Judge and BARRINGTON D. PARKER, District Judge.

### MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge.

In this three–judge District Court proceeding we are called upon to determine whether three enactments of the Alabama Legislature establishing at–large elections for members of the County Commission of Hale County, Alabama comply with section 5 of the Voting Rights Act of 1965.[1] Section 5 prohibits the enforcement of any change in voting procedures used by certain states or their political subdivisions until the change has been approved by the Attorney General of the United States. Absent that approval the proponents of the change must demonstrate to a three–judge panel of the United States District Court for the District of Columbia that it has neither the purpose nor effect of denying or abridging the right to vote on account of race or color. Following the Attorney General's disapproval of the three enactments, Hale County, acting through the County Commission,[2] its governing body, brought this suit seeking a declaration that the changes in the manner of electing commissioners are not discriminatory, either in purpose or in effect.

---

1. 42 U.S.C. § 1973c. The complete text of section 5 is set out in Appendix A.

2. The additional plaintiffs are the four members of the Hale County Commission, Clifton

Abernathy, Clark Livingston, Woodye Barnette, and John Stokes, and Hale County Probate Judge Richard Avery, who is *ex officio* chairman of the Hale County Commission.

The parties agreed that the evidence in this case, composed of the in-court testimony of several witnesses, depositions, and exhibits, would first be presented at trial before a single judge. Following that, the full panel heard and considered the final argument of trial counsel on all factual and legal aspects of the controversy. In connection with the final argument, the panel had the benefit of the complete record made before the single judge.

After a consideration of the entire record and the oral presentation of counsel, we conclude that the change to at-large voting embodied in the three enactments had the purpose and has had the effect of abridging the right to vote on the basis of race. For this reason, the plaintiff's request for declaratory judgment must be denied. In the opinion which follows we present first, our findings as to the material facts and second, our legal analysis and conclusions.

## I.

### Factual Findings

Hale County is located in west central Alabama close to the Alabama-Mississippi state line. It is within 40 miles of Selma to the southeast and less than 80 miles from Montgomery, the capital of the State. The area is predominantly rural and its residents are predominantly black. It covers approximately 662 square miles. The political, economic and social life of the area is centered in and around the County seat, Greensboro, a city of approximately 3400.

The County is part of a region often referred to as the "Black Belt." This area embraces "a group of counties in eastern Virginia and North Carolina; a belt of counties extending from the South Carolina coast through South Carolina, central Georgia, and Alabama; and a detached area embracing a portion of the lower Mississippi River Valley."[3] As employed by the Bureau of Census and authoritative sources on American history, the term "Black Belt" refers to an area of relatively high density of Negro population, specifically those counties in which the proportion of Negroes in the total population was 50 percent or more.[4]

The 1970 Census reported a total population of 15,888 for Hale County, of whom 10,542, or 66.4 percent, were black, and 5,336 were white. The same source reported that of the total voting age population of 9,227, slightly more than 59 percent or 5,460 were black.[5] As of October, 1978, there were 8,443 registered voters in the County, and of this total 4,296 or 50.8 percent were black and 4,150 were white.[6]

Hale County's affairs are managed by a Board of Commissioners, formerly known as the Board of Revenue. At present it is comprised of four elected commissioners and the county probate judge. The probate judge, an elected county official, serves as an *ex officio* member who presides at commission meetings and votes only in the event of a tie between the four regular commissioners.[7] The commissioners conduct and oversee in a general sense the business of Hale County. Their chief func-

---

3. Bureau of the Census, Negro Population 1790-1915, 125 (1918).

4. Bureau of the Census, Negroes in the United States 1920-1932, 70 (1935); *see* E. Franklin Frazier, The Negro in the United States, 187-190 (1949); C. Van Woodward, Origins of the New South 1877-1913, 178-79; Ch. IV *passim*, (1951); *see also*, Bureau of the Census, Negro Population 1790-1915, Ch. VIII, (1968); W. E. Burghardt DuBois, The Souls of Black Folk, 88-103 (1961).

Some familiar with the region, however, attribute the name "Black Belt" to the dark, fertile soil of the area rather than the color of its population. *See* E. Morgan, A Time to Speak, 101 (1964).

5. Stip. 2, Part A, ¶ 2.

6. Stip. 2, Part A, ¶ 3.

7. Trial Transcript I, 30 (October 22, 1979). Testimony of Richard Avery.

The trial transcript in this proceeding was not paginated consecutively over the entire four days of trial. As a result, the Court will refer to a specific volume of the transcript as follows: Tr. I for the transcript of October 22, 1979; Tr. II for October 23; Tr. III for October 24; and Tr. IV for October 25.

tions are to raise and allocate revenue and to supervise and operate public works, particularly road maintenance.[8] In addition, they and the probate judge play a significant role in the electoral process.[9] The commission meets on a regular bi–weekly basis on the second and fourth Tuesdays of the month. The meetings are announced in the local press and are open to the public.[10]

Each commissioner is elected for a four year term and their terms are staggered so that a term of two incumbents expires every other year. The probate judge is elected for a term of six years on an at–large basis.[11] All of the present commissioners and the probate judge are white.

### A.

In 1953, by an act of the Alabama Legislature, Hale County was divided into four districts, each represented by a single commissioner. Under the system then established, commissioners were elected county–wide by the voters of the entire county, although candidates were required to reside in the district they sought to represent.[12] This system prevailed until 1959, when the Alabama Legislature enacted a statute which modified the district boundaries and required candidates for commissioner to reside in the district they desired to represent and to be elected only by the voters of that particular district.[13]

In 1965, however, the legislature reversed itself as to the last provision by passing new legislation. While the 1965 Act retained the 1959 geographic districts and residency requirement, it provided that commissioners be chosen by "qualified electors of the entire County or at–large."[14] In 1971, the legislature removed the district residency requirement so that candidates need only be residents of the County.[15] The at–large voting requirement remained unchanged. Finally, in 1973, the legislature restored the district residency requirement for commissioners and redrew the boundaries of the prior existing districts to provide for equal populations in each district.[16] The at–large voting requirement was not altered. The 1965, 1971, and 1973 statutes providing for county–wide voting are the subject of this lawsuit.

Under section 5 of the Voting Rights Act, the changes effected by the three acts could not be implemented until they had been "precleared" by the Attorney General.[17] The County's governing body did not comply with this requirement and held both primary and general elections for the commission posts on an at–large basis through the May, 1976 primary elections. Immediately following the primary, the Attorney General filed suit against Hale County in the United States District Court for the

---

8. Act No. 61, §§ 4–7 (June 3, 1953); 1953 Ala. Acts 90–91. Appendix B. Tr. I, 36–37 (testimony of Richard Avery); Deposition of Clifton Abernathy, 17–21.

9. In primary elections the probate judge is responsible for preparing ballots and voting machines, for accepting nominating certificates from the political parties, for providing lists of voters for each precinct, and for receiving and transmitting certificates showing vote tabulations. Ala.Code §§ 17–13–7, 17–16–11, 17–16–22; Tr. Vol. I, 61. The County Commission has the power to authorize additional days for voter registration when asked to do so by the Board of Registrars. Tr. I, 64–67; Deposition of Sue Seale (Chairman and Clerk of Hale County Board of Registrars), 6.

10. Tr. I, 73–74 (testimony of Richard Avery); Deposition of Clifton Abernathy, 10.

11. Ala.Code § 17–2–7.

12. Act No. 61 § 2; 1953 Ala.Acts 89–90. Appendix B.

13. Act No. 370 (Nov. 6, 1959), 1959 Ala.Acts 961–62; Pl.Ex. 7. Appendix C.

14. 1965 Ala.Acts 439–41; Pl.Ex. 10. Appendix D.

15. Act No. 2022 (September 20, 1971), 1971 Ala.Acts 3261–62; Pl.Ex. 8. Appendix E.

16. Act No. 620 (Aug. 27, 1973), 1973 Ala.Acts 925–26; Pl.Ex. 9. Appendix F.

17. Section 5 allows a change to be enforced if it is submitted to the Attorney General, "and the Attorney General has not interposed an objection within sixty days after such submission, . . . ." 42 U.S.C. § 1973c.

Southern District of Alabama[18] to enjoin the 1976 general election scheduled under the at–large plan. That court determined that the changes in the manner of electing commissioners were subject to the section 5 preclearance requirement. Accordingly, Hale County was ordered to revert to the method of electing commissioners under the 1959 Act: election by districts as opposed to county–wide.[19] Because of its proximity, the November 2, 1976 general election was allowed to proceed on an at–large basis and the elected commissioners were permitted to serve provisionally pending further order. In addition, the Hale County commissioners were required to submit forthwith the 1965, 1971, and 1973 Acts to the Attorney General for preclearance.[20] On October 29, 1976, Hale County complied with the court's directive and subsequently, on December 29, 1976 the Attorney General interposed an objection to the three statutes.[21] Shortly thereafter, on February 16, 1977, plaintiffs brought the present action for declaratory relief under section 5. Elections for commissioner since that time have been held under the provisions of the 1959 Act.[22]

### B.

The 1965 Act, which changed the manner of electing commissioners from a district to an at–large system with a residency requirement, is the critical legislation in this proceeding. The 1971 and 1973 Acts are subject to review in that they retained the suspect at–large feature, first enacted in 1965. Any inquiry into the purpose behind the change to the at–large commission elections must of necessity center on the 1965 Act.

The 1965 Act had its genesis in a resolution favoring a change to at–large elections passed by the Hale County Board of Commissioners on January 25, 1965. The minutes of that meeting reflect that the only reason advanced in support of the proposal was that the change "would be for the best interest of the County."[23] The plaintiffs offered no clarification or testimony to show the basis for the determination of the "best interest." The County's counsel drafted legislation embodying the modification, which was then published in the local newspaper.

The proposal was introduced in the Alabama House of Representatives by Richard Avery, who at the time represented the Hale County electorate in the state capital at Montgomery. Mr. Avery served as the County's sole representative from 1959 to 1966. Later, in 1971 he was elected to the county probate judge post, a position he has held since his first election.

Judge Avery's trial testimony concerning the 1965 legislative enactment and his efforts in shepherding it through the Alabama Legislature are of particular interest. He recalled that it was a type of "local" legislation usually passed after only *pro forma* consideration, as a courtesy to the legislator representing the affected locality. Thus, there was no record of any hearing or legislative debate preceding its passage, and from all indications the measure faced no opposition.[24] The Judge recalled and testified in part that he sponsored the proposal as a response to his awareness "of the needs of the people in the community, both black and white" and that "the majority of the

18. *United States v. Hale County*, 425 F.Supp. 433, (S.D.Ala.1976) aff'd, 430 U.S. 924, 97 S.Ct. 1540, 51 L.Ed.2d 768 (1977).

19. 425 F.Supp. at 436.

20. *Id.*

21. Letter from Assistant Attorney General Pottinger to W. McLean Pitts, December 29, 1976. Complaint Ex. 7.

22. The 1978 commissioner elections for Districts 1 and 4 were held using a district election plan and the 1959 boundaries, but only after the Alabama district court held Hale County Probate Judge Richard Avery in contempt of its October 18, 1976 Order for accepting nominations of commissioner candidates for an at–large election. *United States v. Hale County*, No. 76–403–P (S.D.Ala.) (Order and Judgment entered Sept. 6, 1978).

23. Def.Ex. 1.

24. Tr. II, 104–06.

people wanted to have a county–wide election." [25] As he explained, their reasons were that commissioners so elected are more aware of and respond to the needs of the entire citizenry. While he was not approached by any official or particular group about the proposed measure, he testified that there was "unrest" and dissatisfaction among the general population with the performance of the commissioners under the district system. The at–large system was viewed as a way of assuring a more equitable and efficient means of distributing road maintenance and services, a matter of some consequence to the community.[26]

On both his direct and cross–examination the Judge declared that the proposal was in no manner calculated to prevent the black community from participating in the political process. Former Commissioner Goldsby Tucker, a member of the Commission when the initial resolution was passed, also denied that there was a discriminatory purpose for the change.[27] We note, however, that on March 23, 1965, the United States Senate began public hearings on legislation which eventually was enacted as the 1965 Voting Rights Act.[28] We also note that on the day before, March 22, 1965, the Alabama Legislature adopted a resolution condemning "outside agitators, communist sympathizers, and well meaning, but socially ignorant crusaders, [who have] skillfully laid the ground work for such a vicious piece of legislation by stirring up strife and dissension in this area in particular and throughout this country generally." [29] The resolution implored Alabama's congressional delegation in Washington "to use every effort and all means available to prevent this vicious proposal from being presented to Congress, and to redouble their efforts to defeat it if it is so introduced." [30] Although Judge Avery was a member of the Alabama Legislature at the time, he had no recollection whether or not he voted for the particular resolution or even that such a measure had been introduced.[31] Moreover, despite this resolution and the nationwide media attention then directed to on–going activity of the civil rights movement in the nearby city of Selma, he testified that at the time he was not familiar with any of the provisions of the Voting Rights Act. His final observation was "I don't think many people in our county were even concerned with the Civil [Voting] Rights Act." [32]

The United States Congress enacted the Voting Rights Act on August 6, 1965 [33] and on August 9, the Attorney General certified Hale County as among the first jurisdictions to which federal registrars would be sent to facilitate black voter registration.[34] The next day, August 10, the Alabama Legislature passed the 1965 Act, mandating at–large elections of the Hale County commissioners.[35] The measure was then submitted by referendum to the voters of Hale County, and on November 30, 1965, it was approved in a special election by a vote of 684 in favor and 426 opposed.[36]

25. Tr. I, 35; II, 105–06.

26. Tr. I, 39, 42–43.

27. Tr. I, 46; Tr. II, 116; Deposition of Goldsby Tucker, 12–16. Commissioner Tucker seconded the motion to adopt the resolution calling for a change to at–large elections. He admitted that in "years gone by" race had probably been an issue when such changes were made, but denied that it was a consideration in the 1965 change. Deposition at 12.

28. S.Rep.No. 162, 89th Cong. 1st Sess. (1965), U.S.Code Cong. & Admin. News 1965, p. 2437. The initial voting rights bill was introduced on March 18, 1965, 111 Cong.Rec. 5411.

29. Act No. 98 (March 22, 1965), 1965 Ala.Acts 112 (Special Session). Appendix G.

30. *Id.*

31. Tr. II, 124.

32. Tr. I, 46.

33. Pub.L.No. 89–110, 79 Stat. 437.

34. 30 Fed.Reg. 9970.

35. *See* note 14 *supra* and accompanying text.

36. Pl.Ex. 11. The question put to the voters was worded:

Shall the provisions of Act No. 320 enacted at the 1965 Regular Session of the Legislature which change the method of electing members of the board of revenue of Hale County, be adopted?

### C.

Prior to enactment of the Voting Rights Act of 1965, would–be black voters in Hale County faced virtually insurmountable obstacles to registration. Before 1965, both the poll tax and the literacy test were used throughout Alabama to exclude black citizens from the political process.[37] Blacks attempting to register were frustrated and harassed by white officials. In her deposition Theresa Burroughs, a black resident of the County with three years of college education, recalled an attempt to register in the late 1950's:

And, on that first Monday, well, I remember in particularly a gentleman, a minister–he has since deceased–was named Rev. Simmons, he and I would go together. He would come by and we would come up on these first Mondays. And, we would attempt to register. We would go and ask for the form, and they would be sitting playing dominos around the table

.     .     .     .     .

All of them would be sitting around, and we would stand and wait while they played dominos around the table. And, then they would say, "Well, what you want, girl," or "What is it, gal," "What are you up here for." And, we say, "We came to register," and they would continue to play, and we would continue to stand. Maybe, it would take two hours; maybe, one; maybe, three, that we would stand there. And, they would play dominos. And, so finally they would take a

paper and throw it to us and say, "Fill that out." And, we would attempt to fill it out. And, down on the bottom it says, "Write the second line of second paragraph or the first line of the Constitution", something of that sort, along with "your name, your address, your age and why do you want to vote." All this–these are the types of forms that they had for us to fill out.[38]

Those who passed the initial hurdles still faced the literacy test, and even college educated black applicants were forced to take the test numerous times before passing.[39] Within the same time frame as Burroughs, Lewis Black, a black schoolteacher, testified at his deposition that a white election official advised him to secure the recommendation of a registered white voter. Once the letter was secured, it served as his passport: Black managed to pass the literacy test, even though he answered the questions in the same manner as in his earlier unsuccessful attempts.[40] Before passage of the 1965 Voting Rights Act these exclusionary practices proved highly successful. Although more than 10,000 black persons resided in Hale County, the County Board of Registrars registered only eighteen blacks in the seven years between January 1955 and January 1962.[41] The effects of these practices apparently continued well into the 1960's. As of May 1964, the United States Commission on Civil Rights found that there were only 236 registered "non–white" voters in Hale County, or approximately 3.9 percent of the black voting age population recorded in the 1960 Census.[42]

Judge Avery testified that he made no efforts to explain the impact of Act No. 320 to anyone, unless he was asked.

**37.** *See United States v. Alabama*, 252 F.Supp. 95 (M.D.Ala.1966) (poll tax); *United States v. Alabama*, 192 F.Supp. 677 (M.D.Ala.1961) (literacy test). As to the use and impact of the literacy test in Hale County, see Tr. II, 84–86 (testimony of Richard Avery); Deposition of Lewis Black, 8–12; Deposition of Mildred Black, 7–10; Deposition of Theresa Burroughs, 9–10; Deposition of Juanita Nabors, 7–10.

**38.** Deposition of Theresa Burroughs, 10–11.

**39.** Deposition of Lewis Black, 9; Deposition of Mildred Black, 7; Deposition of Theresa Burroughs, 9–10.

**40.** Deposition of Lewis Black, 11-12.

**41.** Stip. 2, Part A, ' 8.

**42.** United States Civil Rights Commission, Political Participation, (Report to Congress) 224–25 (1968). In contrast, 4,824 whites were listed as registered, even though this number represented more than 100 percent of the white voting age population of Hale County in the 1960 Census.

By the end of 1966, within sixteen months after the passage of the Voting Rights Act, over 3000 black persons were registered through the efforts of the assigned federal examiners.[43] That year also saw the first black candidate for county office since Reconstruction, the Reverend Henry McCaskill. He ran for the Democratic nomination for sheriff in the May 1966 primary election. McCaskill lost the primary after a campaign marred with demonstrations of racial hostility toward his candidacy. He received threatening telephone calls and letters, rocks were thrown through windows of his campaign headquarters, his campaign posters were torn down and replaced by those of white candidates, and threats were made to his campaign workers while they were engaged in voter canvassing.[44]

A second black candidate, Mildred Black, encountered similar resistance in her 1968 campaign for a seat on the Board of Education, as did her husband, Lewis Black, in his 1970 campaign for Probate Judge.[45] Both were defeated by white opponents. And while overt hostility to black candidates and black voters has subsided in recent years,[46] since 1965, black candidates have been unsuccessful in all thirty attempts to win county–wide office, including eleven to win a seat on the County Commission.[47]

### D.

Plaintiffs attribute this lack of success to two factors. First, they argue that a difference in campaign practices accounts for black candidates' poor performance. Where white candidates actively solicit support from members of both races, black candidates have directed their efforts primarily toward black voters.[48] Second, plaintiffs point out that white elected officials have been "responsive" to the needs of their constituents, both white and black, and that this explains much of their success at the polls.[49] Judge Avery gave a number of additional reasons for poor black performance, all generalized and negative in nature. They included the blacks' lack of motivation and desire to work hard, inability to face issues, poor campaigning and lack of effort to get out the vote. Of the several factors he mentioned, the main one was an unwillingness to work hard to get out the vote.[50] Thus, according to plaintiffs, there are factors other than race which have accounted for voting patterns in Hale County over the past fifteen years.

While there is considerable evidence to show that many government benefits and services have been fairly dispensed to both black and white residents of Hale County, race, rather than "responsiveness," still remains the dominant factor in explaining voting patterns in Hale County. Both the white and black electorate tend to engage in racial bloc voting. Such voting is defined as the propensity of voters, when presented with candidates of different races, to vote for the candidate of their own race.[51] The best evidence of racial bloc voting is produced by analyzing the results

43. Def. Ex. 10.

44. Stip. 2, Part A, ' 6; Deposition of Henry McCaskill, 20–21; Deposition of Theresa Burroughs, 16–17, 55–57; Deposition of Lewis Black, 19–23; Deposition of Mildred Black, 16–17.

45. Deposition of Mildred Black, 27; Deposition of Lewis Black, 48–50.

46. *See* Deposition of Lewis Black, 111.

47. *See* Stip. 2, Part A, ' 9. On several occasions, black candidates have been among the top vote–getters in primary elections, only to lose in the subsequent run–off. See notes 66–69 and accompanying text.

48. Tr. I, 67–72 (testimony of Richard Avery); Deposition of John B. Stokes, 8–10; Deposition of Clifton Abernathy, 7–10.

49. Tr. II, 5. For examples of plaintiffs' "responsiveness," see Tr. I, 76–84 (testimony of Richard Avery); Depositions of John B. Stokes and Clifton Abernathy, *passim*.

50. Tr. II, 25.

51. *City of Rome v. United States*, 472 F.Supp. 221, 226 (D.D.C.1979), aff'd, 446 U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980).

of elections involving black and white candidates for the same office.[52] Defendants' expert witness, Dr. James Loewen, examined eight such contests held in Hale County between 1970 and 1978.[53] His findings indicate strong racial bloc voting by members of both races. Invariably over 90 percent of the white voters voted for white candidates, and usually between 80 and 90 percent of black voters voted for black candidates.[54] Dr. Loewen, a political sociologist with considerable experience in voting rights cases, observed that these figures were as high as any he had previously encountered.[55]

Despite the combination of a majority of the voting age population, a slight majority in registered voters and racial bloc voting, black candidates have been unsuccessful in countywide elections in Hale County. This may be attributed to a number of factors, which, in turn, may be traced to past discrimination against Hale County's black population. Black educational levels are far below those of the white population: Only 9.4 percent of the black adults in Hale County graduated from high school, as compared to 53.4 percent of the white adults. Moreover, 37.7 percent of the black adults had four or less years of education, compared with only 5.8 percent of the whites. This disparity in education corresponds to similar disparities in occupational and economic status. Fifty–three percent of the working whites hold white collar jobs com-

**52.** Id. at 226 n. 36. Defendants have adopted this approach to establishing the presence of racial bloc voting. See Tr. III, 108–113 (testimony of James Loewen). Plaintiffs, however, adopted a different approach in their efforts to disprove the existence of racially polarized voting. Plaintiffs' expert stated that polarized voting could be demonstrated by examining contests involving two or more white candidates. Tr. III, 17 (testimony of James Voyles). While this approach might indicate bloc voting by blacks for or against a particular candidate, it would be less likely to reveal bloc voting by whites, Tr. III, 108–110 (testimony of James Loewen), which is a critical factor in demonstrating the effect of the changes in the voting procedures at issue here. See notes 62 65, infra, and accompanying text.

Defendants also questioned the manner in which plaintiffs' expert tested some of the contests involving black candidates. Plaintiffs' expert analyzed the results in a large number of election contests in Hale County to determine if there was any correlation "between race and the vote that the candidate who won the race [contest] received." Tr. III, 14 (testimony of James Voyles). Defendants' expert pointed out, however, that in races involving more than two candidates, one of whom was black, plaintiffs' method could result lumping together a losing black candidate's and a losing white candidate's votes and then testing that total for racial bloc voting. This practice could easily understate the extent to which racial bloc voting is actually taking place. See Tr. III, 128–32 (testimony of James Loewen); Def. Ex. 30.

**53.** Dr. Loewen analyzed one race in each election year from 1970 through 1976. (Deposition of James Loewen, 8–10) and four additional contests in the 1978 primary and primary run off. Tr. III, 113–114. Each contest involved a black candidate with white opposition. In se-

lecting contests to analyze, Dr. Loewen explained that he examined those in which the black candidate won the most votes because they presented the greatest possibility of determining if whites would in fact cross racial lines to vote for black candidates. Deposition at 8 9.

The analysis consisted of three steps. First, Dr. Loewen performed a correlation analysis to determine if any relationship existed between the proportion of white voters in the electorate and the proportion of the vote going to the white candidates. Tr. III, 117 19 (testimony of James Loewen); Deposition at 14–16. In order to verify the strong inferences of racial bloc voting which appeared through the correlation analysis, Dr. Loewen then performed an overlapping percentages analysis on a selected number of overwhelmingly white beats. Overlapping percentages is a purely arithmetic process which enabled defendant's expert to state with certainty that, at least in the precincts examined, the absolute minimum percentage of whites voting for white candidates was 95 percent. Finally, Dr. Loewen performed a Goodman Ecological Regression for the County as a whole to test further the reliability of his earlier correlation analysis. Tr. III, 117 34, 145–50 (testimony of James Loewen); Deposition at 14–24. Def. Ex. 13–15, 29, 32, 33.

**54.** Def. Ex. 13–15, 29 Tr. III, 134–35, 145–50; Deposition of James Loewen, 14 24. The minimum percentages of whites voting white and blacks voting black produced by regression analysis were somewhat lower, but even these minimums show substantial racial bloc voting. Id.

**55.** Tr. III, 139.

pared to only 14.4 percent of blacks; white median income in 1970 was $7000 compared to $2756 for blacks.[56]

These factors affect potential black voters in several ways. Poorly educated persons have comparatively more difficulty in filling out forms and complying with other formalities accompanying the registration process.[57] Wage earning blue collar workers have less flexibility in their working hours than salaried white collar workers, and therefore find it more difficult to take leave from work so as to register or to vote at convenient times during the day.[58] Finally, low income hinders political participation by restricting access to information and by increasing the inconvenience of registering and voting.[59]

In addition to proof of purely educational and economic impediments, the United States produced testimony that would-be black voters in Hale County still face subtle forms of discrimination and economic intimidation. The legacy of many years of discrimination and harassment has not completely disappeared in the fifteen years since the Voting Rights Act. Black poll watchers have been hindered in attempts to monitor voting[60] and black workers have refrained from voting for fear of angering employers.[61]

Taken together, these factors do much to explain why, although a majority of the voting age population, blacks have never comprised a majority of those actually casting ballots in a Hale County election. For example, for the 1972 general election, federal observer statistics show that only 44.6 percent of those voting were black.[62] This comparatively lower black turnout highlights the importance of racial bloc voting, particularly that of the white electorate. Both plaintiffs' and defendants' expert witnesses agreed that to win an election in Hale County, a black candidate would need to draw a significant number of white votes.[63] Yet, as both experts again agreed, none has ever done so.[64] Given existing racial bloc voting patterns and a majority vote requirement in the primary,[65] black candidates are effectively foreclosed from winning an elective office such as county commissioner under an at-large system.

The effect of bloc voting in at-large races is demonstrated by comparison of election results in county commissioner races involving black and white candidates. Of the four commissioner districts established by the 1959 Act, two districts, District 2 and District 3, display black majorities both in population and in registered voters. When the 1973 district boundaries are used, the percentages change but blacks retain majorities in both population and

---

**56.** Deposition of James Loewen, 40–45; Def. Ex. 20, 21 (Deposition Exhibits 11, 12); Tr. III, 162. (testimony of James Loewen).

**57.** Tr. IV, 9 (testimony of James Loewen); Deposition of James Loewen, 41–42.

**58.** Tr. IV, 7–8 (testimony of James Loewen); Deposition of James Loewen, 42–44.

**59.** Deposition of James Loewen, 46.

**60.** Deposition of Lewis Black, 21–23; Deposition of Theresa Burroughs, 20–21, 37–39. Despite gains in black registration, whites hold the important positions regulating the electoral process. The Hale County Board of Registrars, a three-member body appointed by state officials and charged with registering eligible voters, has never had a black member. Deposition of Sue Seale, (Chairman and Clerk of the Board of Registrars), 59. Although there was no concrete evidence of any impropriety in the

administration of voting lists, Mrs. Seale could not explain why the names of those voters registered by federal officials- virtually all of them black-appeared typed in upper case letters in the Board's records of registered voters. *Id.* 52–55.

**61.** Deposition of Lewis Black, 60–61, 93–96; Deposition of James Loewen, 47.

**62.** Tr. III, 155–161 (testimony of James Loewen); Def. Ex. 17.

**63.** Tr. III, 86–87 (testimony of James Voyles); Tr. III, 153 (testimony of James Loewen).

**64.** *Id.*

**65.** Alabama law requires a runoff between the top two vote-getters in the event that no candidate in a primary election wins a majority of the vote. Ala.Code § 17–16–36.

registered voters.[66] To illustrate the effect of at–large as opposed to district commissioner elections, the United States presented a statistical breakdown of commissioner races where a black candidate opposed a white candidate. Six contests were analyzed under the 1959 districts, and four of these were reanalyzed under the reapportioned 1973 districts.[67] Under the 1959 boundaries, black candidates invariably carried District 2, the more heavily black district. Neither however, managed to win a commissioner's seat in the at–large general election.[68] Under the 1973 reapportioned districts, the black candidate in 1972 again carried District 2. In the 1974 Democratic primary races, the black candidate carried both District 2 and District 3 in both the primary and the primary run–off, but nonetheless lost the run–off at–large.[69]

These two examples confirm the inference drawn from the population figures: at-large, as opposed to district, commissioner elections, when combined with strong racial bloc voting patterns, have prevented black candidates from gaining a seat on the Hale County Board of Commissioners.

## II.

### LEGAL ANALYSIS AND CONCLUSIONS

It has long been determined that the Voting Rights Act of 1965 was passed to protect the rights guaranteed by the Fifteenth Amendment and to "rid the country of racial discrimination in voting." *South*

*Carolina v. Katzenbach*, 383 U.S. 301, 315, 86 S.Ct. 803, 812, 15 L.Ed.2d 769 (1966). To help achieve this goal, section 5 of that Act requires that jurisdictions which in the past employed the poll tax, the literacy test, and other devices to deprive citizens of voting rights, must first submit any change in voting procedure to the United States Attorney General for preclearance. The 1965, 1971 and 1973 Acts of the Alabama Legislature which modify Hale County's voting procedures to require at–large elections for County commissioner has been held subject to section 5 preclearance. *United States v. Hale County*, 425 F.Supp. 433 (S.D.Ala. 1976), *aff'd*, 430 U.S. 924, 97 S.Ct. 1540, 51 L.Ed.2d 768 (1977). Because the Attorney General has denied preclearance, Hale County seeks in this proceeding a declaration that the change to at–large voting was not motivated by a discriminatory purpose and has not had a discriminatory effect. The burden of proof for securing such a declaration is placed squarely on the plaintiffs. *Georgia v. United States*, 411 U.S. 526, 538, 93 S.Ct. 1702, 1709–1710, 36 L.Ed.2d 472 (1973); *South Carolina v. Katzenbach, supra.*

After reviewing the entire record before us, we conclude that Hale County has failed to shoulder its burden. The plaintiffs have not shown, as they must, either the absence of a discriminatory purpose behind the change to at–large elections or the lack of a discriminatory effect following its implementation.[70]

---

**66.** Under the court's Order in *United States v. Hale County, supra,* the 1959 districts, although severely malapportioned, are still in use. Where the existing districts are unbalanced, it is appropriate to measure the effect of voting changes under a properly apportioned district plan. *Wilkes County v. United States*, 450 F.Supp. 1171, 1178 (D.D.C.), *aff'd,* 439 U.S. 999, 99 S.Ct. 606, 58 L.Ed.2d 674 (1978).

**67.** Def. Ex. 23, 24; Stip. 3, Declarations of Linda Swift, Diane E. Corwell, Donna Clarke, and Robert Kwan. The population figures are based on the 1970 Census; the registered voter totals on October 1977 data supplied by Hale County. Def. Ex. 26.

**68.** Def. Ex. 22. The six contests analyzed, involving the efforts of four different black candi-

dates to win a commissioner seat, were the 1970 general elections for commissioner Districts 1 and 4, the May 1972 primary election for District 2, the June 1972 primary runoff for District 2, the May 1974 primary for District 4 and the June 1974 primary runoff for District 4.

**69.** Def. Ex. 28. The 1970 general election was not analyzed under the 1973 commissioner districts.

**70.** At final argument, plaintiffs' counsel took the position that the Court should focus on the 1973 Act rather than the 1965 statute, since that earlier Act has in effect been repealed. Transcript of Final Argument, 42. This argument ignores the critical point that the change to at–large voting was first enacted in 1965,

In the discussion which follows we consider first, the effect of the change and second, the evidence concerning its purpose. We follow this order, because, as our analysis shows, the government has clearly established by convincing evidence the discriminatory effect of the change to at–large commissioner elections. The government's evidence on the issue of motive is less overwhelming than its proof of a discriminatory effect. It nonetheless persuades us that a discriminatory purpose did, in fact, lie behind the change to at–large elections. The "purpose" test therefore provides an alternative ground for denying the declaratory judgment.

### A. Effect of the Change to At–Large Elections

To prove that the change in 1965 to at–large voting did not have a discriminatory effect, the plaintiffs must demonstrate that it did not amount to a retreat from the potential advantage previously held by black voters in Hale County. As the Supreme Court has stated, the party seeking the declaratory judgment must show that the change will not "lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer v. United States,* 425 U.S. 130, 141, 96 S.Ct. 1357, 1364, 47 L.Ed.2d 629 (1976). Within the framework of this litigation, the *Beer* "retrogression" standard requires that Hale County prove that the change in 1965 to at–large elections for the commissioners left the County's black population with at least as much electoral power as they possessed under the

district system. Plaintiffs have attempted to carry this burden by pointing out that in the entire County, blacks comprise a majority of the voting age population and hold a slight edge in the number of registered voters. Under the at–large election system, therefore, blacks could elect all four commissioners and the probate judge as well, whereas under the district system majorities in only two districts would limit blacks to electing two commissioners. Accordingly, the plaintiffs urge that a straightforward analysis of the statistical data before the Court demonstrates that black voting strength was enhanced rather than reduced by the change to the at–large system.[71]

Plaintiffs' appraisal of the effect of at–large voting fails to take into account the chronically low black voter turnout. Although numerically a "majority," Hale County's black population "is an identifiable and specially disadvantaged group" suffering from all the problems associated with minority status and must be considered a "minority" for purposes of this litigation. *See Graves v. Barnes,* 343 F.Supp. 704, 730–31 (W.D.Tex.1972), *aff'd in relevant part, sub nom. White v. Regester,* 412 U.S. 755, 768–70, 93 S.Ct. 2332, 2340–2341, 37 L.Ed.2d 314 (1973). Where, as in Hale County, there is a history of "sweeping and pervasive" past discrimination and a present disproportion in minority electoral participation, the plaintiffs have the burden of showing that the past discrimination no longer affects present voting patterns. *See NAACP v. City of Darien,* 605 F.2d 753, 759 (5th Cir.1979). Plaintiffs,

---

and has been reenacted without modification in 1971 and 1973. Any inquiry into the purpose of the switch from district to at–large elections would logically center on the statute effecting the change, the 1965 Act, and not on later reenactments. The 1971 and 1973 Acts were denied preclearance because they perpetuated the at–large system. Plaintiffs' request for a declaratory judgment as to these two Acts will be denied for the same reason.

**71.** Plaintiffs cite *Dallas County v. Reese,* 421 U.S. 477, 95 S.Ct. 1706, 44 L.Ed.2d 312 (1975), *Dusch v. Davis,* 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656 (1967), and *Fortson v. Dorsey,* 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965)

for the proposition that at–large voting for multi–member bodies such as the County Commission is a legitimate, and even desirable practice. None of theses apportionment decisions, however, presented the issues of racially discriminatory purpose or effect which are at the heart of a section 5 proceeding. Moreover, in sustaining the at–large plans presented in those three cases, the Court indicated that such plans could be attacked by a showing of invidious discrimination, *see* 421 U.S. at 481, 95 S.Ct. at 1708; 387 U.S. at 117, 87 S.Ct. at 1556; 379 U.S. at 439, 85 S.Ct. at 501, thereby acknowledging that the at–large device may be a vehicle for effecting an illegitimate end.

however, produced no evidence to rebut defendants' expert and lay testimony which linked low black voter turnout to the many years of social, economic, and political discrimination. Given the evidence before this Court, showing both lower black participation attributable to past discrimination and overwhelming white racial bloc voting, plaintiffs cannot maintain their theory that the at–large system enhances the position of the black electorate.

Examination of Hale County's experience with the at–large system in fact demonstrates its retrogressive effect. The change from district to at–large commissioner elections at the time when large numbers of black citizens were voting for the first time, greatly reduced the ability of black voters to elect their candidates to Hale County's governing body. The United States produced strong evidence that, but for the change to at–large elections, black candidates would have been elected to the County Commission on at least two occasions.[72] When this fact is compared with black candidates' actual record under the at–large system, it becomes clear the plaintiffs cannot prove, in theory or in practice, that the changes effected by the 1965 Act have not worked a retrogression on the position of black voters in Hale County. *Beer v. United States, supra ; Wilkes County v. United States*, 450 F.Supp. 1171 (D.D.C.), *aff'd*, 439 U.S. 999, 99 S.Ct. 606, 58 L.Ed.2d 674 (1978).

## B. Purpose of the Change to At–Large Elections

Plaintiffs stress the fact that Hale County's voters approved the change to at–large commissioner elections by referendum nearly four months after the Voting Rights Act was passed and federal examiners had been assigned to register black voters. This fact alone, however, does not demonstrate that the change was in fact supported by the County's black residents. Neither party produced evidence to show even the approximate number of black registered voters at the time of the referendum, November 30, 1965. We recognize, however, under the

circumstances of this case, that it was plaintiffs' burden to produce such proof. It is reasonable to conclude from the developed record that up until passage of the Voting Rights Act in August, 1965, there were very few registered black voters in Hale County. In fact, a May, 1964 count revealed only 236. And while federal examiners managed to register over 3,000 blacks by the end of 1966, it is by no means clear how many of these voters had been registered by the time of the referendum. On the basis of such sketchy evidence, we cannot find or conclude that the plaintiffs demonstrated that the change was approved by an electorate containing a significant representation of black voters.

Plaintiffs also failed to carry their burden of showing the absence of a discriminatory purpose in the Legislature's enactment of the change. No contemporaneous record was produced to show the purpose for the 1965 Act. Through the testimony of Probate Judge Avery and Goldsby Tucker, a former member of the Commission, plaintiffs attempted to prove that the 1965 change from district to at–large commissioner elections was motivated by the need for centralized control over road repairs. That testimony, however, must be viewed with skepticism for several reasons. First, although Judge Avery was the sponsor of the 1965 Act, his trial testimony under these circumstances, fourteen years after its enactment, is certainly less reliable and should be accorded relatively less weight than any statement he might have made to the legislature prior to or at the time of the bill's passage. The deposition testimony of former Commissioner Tucker, who likewise supported the initial resolution requesting the change, is subject to the same caveat. Second, both Judge Avery and Commissioner Tucker are "interested witnesses" in that they were both proponents of the questioned change and continued to serve as County officials after its enactment. *City of Richmond v. United States*, 422 U.S. 358, 377, 95 S.Ct. 2296, 2307, 45 L.Ed.2d 245 (1975).

**72.** See notes 65–68 *supra* and accompanying text.

Moreover, a legislator's subsequent statements as to an enactment's purpose are not the sole source to be examined in an inquiry for a discriminatory purpose. As the Supreme Court has pointed out:

> Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another. It is also not infrequently true that the discriminatory impact . . . may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds.

*Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976). In *Village of Arlington Heights v. Metropolitan ·Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), the Court gave further guidance to courts examining official acts for discriminatory purpose:

> Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action—whether it "bears more heavily on one race than another," *Washington v. Davis*, [426 U.S.], at 242 [, 96 S.Ct. at 2049]—may provide an important starting point. Sometimes a clear pattern, ·unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face. . . .
>
> The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes. . . . The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes. . . . (Citations omitted).

429 U.S. 266–267, 97 S.Ct. at 564. Examination of the record in light of these standards reveals considerable evidence of a discriminatory purpose. behind the 1965 enactment.[73]

First, there is the contemporaneous resolution enacted by the Alabama Legislature condemning both local civil rights activity and the proposed Voting Rights Act.[74] That measure eloquently states the views of at least a majority of the Alabama Legislature which less than five months later, passed the measure modifying Hale County's commissioner election procedures. In addition, there are grounds for suspicion where the change to at–large elections was enacted so swiftly after the passage of the Voting Rights Act and the designation of Hale County as one of the first jurisdictions to which federal examiners would be sent. *City of Rome v. United States*, 472 F.Supp. 221, 243 (D.D.C.1979), aff'd, 446 U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980). Finally, an inference of discriminatory purpose may be drawn from the discriminatory effects of the change. Such an inference is particularly reasonable and persuasive in cases under section 5, a provision based on Congressional findings of "pervasive purposeful voting discrimination" in those areas covered by the Act. *City of Rome v. United States*, 472 F.Supp. at 238. After weighing these factors against plaintiffs' evidence of legitimate purpose, the Court finds that a preponderance of the evidence demonstrates that the modifications were in fact enacted with the purpose of abridging the electoral rights of Hale County's black citizens.

We therefore conclude that plaintiffs have failed to demonstrate that the 1965, 1971 and 1973 enactments of the Alabama Legislature did not have the purpose nor the effect of abridging the rights of blacks to vote in Hale County. On the contrary, it clearly appears the change to at–large elections embodied in the three enactments had

---

**73.** The Supreme Court's recent decision in *City of Mobile v. Bolden*, —— U.S. ——, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980) affirms this approach to inquiries into the possibility of a

discriminatory purpose behind an official act.' 100 S.Ct. at 1501.

**74.** See Appendix G.

both the purpose and effect of reducing black voting strength at a time when it first became a factor in Hale County elections. Under the circumstances the declaratory judgment should be denied.

An appropriate order and judgment accompanies this Memorandum Opinion.

### APPENDIX A

Section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c.

Whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the first sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the second sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1968, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the third sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1972, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided*, That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, or upon good cause shown, to facilitate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made. Neither an affirmative indication by the Attorney General that no objection will be made, nor the Attorney General's failure to object, nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure. In the event the Attorney General affirmatively indicates that no objection will be made within the sixty–day period following receipt of a submission, the Attorney General may reserve the right to reexamine the submission if additional information comes to his attention during the remainder of the sixty–day period which would otherwise require objection in accordance with this section. Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28 and any appeal shall lie to the Supreme Court.

### APPENDIX B

Act No. 61 H. 209–Wilson, Richard

### AN ACT

To establish a Board of Revenue for Hale County, and for the abolishment of

the Court of County Commissioners of said County.

*Be It Enacted by the Legislature of Alabama:*

Section 1. That there is hereby created and established in and for the County of Hale in the State of Alabama, a Board of Revenue, hereinafter referred to as the Board, to consist of five members, to wit: The Probate Judge of the County who shall be the ex–officio Chairman of the Board and one member from each of the four districts of said County as hereinafter defined; which Board shall be known as the "Board of Revenue of Hale County, Alabama," and shall take the place of the present Court of County Commissioners of said County which Court of County Commissioners shall cease to exist upon the approval of this Act, and is hereby abolished.

Section 2. That for the purpose of this Act and the enforcement thereof the said County of Hale shall be divided into Four subdivisions, to be known as Districts, and numbered respectively, from one to four, both inclusive. District No. 1 shall embrace and be composed of beats or precincts numbered 1, 2, 12 and 16 as now constituted or as the same may be hereafter changed in boundaries according to law. District No. 2 shall embrace and be composed of beats or precincts numbered 6, 7, 8 and 9 as now constituted or as the same may be hereafter changed in boundaries according to law. District No. 3 shall embrace and be composed of beats or precincts numbered 4 and 5 as now constituted or as the same may be hereafter changed in boundaries according to law. District No. 4 shall embrace and be composed of beats or precincts numbered 3, 10, 11, 13, 14 and 18 as now constituted or as the same may be hereafter changed in boundaries according to law. Walter J. Chandler of said County is hereby named, designated and declared to be the member of said Board from District No. 1. W. H. Knight of said County is hereby named, designated and declared to be the member of said Board from District No. 2. J. Todd Dale of said County is hereby named, designated and declared to be the member of said Board from District No. 3. E. A. Broughton of said County is hereby named, designated and declared to be the member of said Board from District No. 4. The members of the Board hereinbefore named from Districts Number One and Number Four shall hold office for six years from the first Monday after the second Tuesday in January, 1953, and until their successors are elected and qualified, such election to be at the regular November election in 1958 and every four years thereafter. The members of said Board hereinbefore named from Districts Number Two and Number Three shall hold office for four years from the first Monday after the second Tuesday in January, 1953, and until their successors are elected and qualified, such election to be had at the regular November election in 1956 and every four years thereafter. Each member of the Board from a District of the County shall be elected by the qualified electors of the entire county. It being intended that two members of the board from Districts in the county shall be elected every two years commencing with the regular November election of 1956, each to be elected for a term of four years from the first Monday after the second Tuesday of January next after his election and until his successor is elected and qualified, and that each such member of the Board shall be elected by the qualified electors of the entire county. The members of the Board from each of the several Districts of the County shall be at the time of their appointment or election of the age of twenty–five years or over, and, in addition, shall each be a qualified elector of Hale County, and be a citizen of and reside in the District for which he is appointed or elected, both at the time of his appointment or election and during his continuance in office.

Section 3. The Board shall hold regular meetings at the Court House of said County beginning at 10 o'clock A.M. on the second and fourth Monday of each

month, and at such meetings the business of the County shall be taken up, considered and transacted in due order, and the meeting may be adjourned to a day certain. The Chairman of the Board and two members of the Board, or, in the absence of the Chairman, three members of the Board shall constitute a quorum for the transaction of business.

Section 4. Said Board shall perform all duties, and shall have and exercise all the jurisdiction, power and authority now or hereafter required of or granted to and conferred upon Courts of County Commissioners, Boards of Revenue, or other like county governing bodies by the general laws of Alabama, except in so far as the same are or may be in conflict or inconsistent with this act; and the several members of the Board shall likewise perform all the acts, services and duties required of members of the Courts of County Commissioners, Boards of Revenue, or other like bodies, by the general laws of Alabama now in force or hereafter enacted except as may be in conflict with or inconsistent with this Act; and said Board in addition to the foregoing and without any limitation thereon shall have and exercise the following jurisdiction, power and authority, viz: To levy all taxes, both general and special, authorized or required by law in the manner as is now or as may be hereafter required by law; to direct, control, supervise, manage, repair and maintain all property of the County, including but not limited to, machinery and equipment, vehicles, shops, the Court House and Jail and to furnish all necessary light, heat and janitor service therefor, and to supply such stationery, supplies and office equipment as may be needed for the proper handling of the business of the county; to keep the property of the County insured, and to employ or retain competent legal counsel and obtain any other professional or specialized services if in the judgment of the Board the same is needed, and to pay the reasonable expense therefor out of the County treasury.

Section 5. The Board shall employ a County Engineer, at a salary to be fixed by the Board, who must have the Qualifications and perform the duties as required of such County Engineers by Chapter Five of Title 12 of the 1940 Code of Alabama, or as might hereafter be provided by the General Laws of Alabama, and in addition thereto he must have such other qualifications as the Board might require, and he shall, under the direction of the Board, have the general supervision and control of maintaining, repairing and improving the County public roads and bridges and the building of new roads and bridges of the County when such new roads and bridges are established by the Board; he shall recommend to the Board the purchase of all necessary road machinery, equipment and supplies for the proper maintenance and work on such County public roads and bridges, and he shall perform all such other duties and exercise such other authority as may be assigned to him from time to time by the Board. The said County Engineer, subject to the direction by the Board, shall have the authority to employ and discharge overseers, laborers and other employees as are necessary in connection with the construction, maintenance and repair of the County public roads and bridges and in the operation, care and maintenance of the County road machinery and equipment, and in the performance of such other duties assigned to him by the Board, provided, said Board may itself hire or discharge any such overseer, laborer or employee with or without the concurrence of said County Engineer. As provided in this Act the supervision, control and maintenance of the County public roads and bridges and the work in connection therewith must be performed throughout the County as a unit under one authority, subject to the direction by the Board, and not by separate Districts under separate supervision. The Board must also furnish such Engineer transportation for use in the performance of his duties.

Section 6. Each member of the Board elected or appointed from the several Districts shall inspect all the county roads and bridges in his District each three months and report the condition thereof to the Board.

Section 7. The Board shall fix a wage and salary scale for all employees in connection with the construction, repair and maintenance of the public roads of the County which shall be entered on the minutes of the Board.

Section 8. The Probate Judge of the County shall be the Chairman of the Board and shall be its presiding officer; he shall sign the minutes of the proceedings of the Board and shall be a member thereof; he shall sign all contracts entered into by the Board; he shall prepare the order of business for all meetings of the Board and he shall see that all orders thereof are properly executed; in addition, he shall exercise all the authority and perform all the duties as is now or as might be hereafter provided by the general laws of Alabama, with respect to the Probate Judge as ex—officio Chairman of the Court of County Commissioners, and he shall be allowed the same pay and allowances payable in the same manner as is now or may hereafter be provided by the general laws of Alabama, with respect to the Probate Judge as ex—officio Chairman of the Court of County Commissioners.

Section 9. The said Board of Revenue shall elect a Clerk and employ such other clerical assistance as may be necessary, and it shall be the duty of the Clerk to keep the minutes of the proceedings of the Board under the directions of the Board, to issue all notices required by the Board and attend the meetings thereof; to keep the records of the Board and the Register of claims presented against the County and the action of the Board thereon, and perform such other duties as may be required by the Board. The compensation of said Clerk and any other clerical assistance the Board might employ shall be fixed by the Board and their terms of office shall be at the pleasure of the Board. Said Clerk must be required to furnish a bond in the penal sum of not less than $5,000.00 with surety or sureties approved by the Probate Judge, payable to the County and conditioned for the faithful accounting for all moneys of the County which may come into his hands and further conditioned as might be required by the Board. The compensation of such Clerk and other clerical assistance, together with the premiums for the bond of the Clerk, shall be paid from the County Treasury on the warrant of the Probate Judge.

Section 10. That the Members of the Board from the several Districts of the County shall each be paid the sum of $100.00 each month as compensation for the performance of his duties as required by this Act including the attendance at the meetings of the Board, and which sum shall be in lieu of all other compensation, mileage and travelling expenses for regular duties hereunder within the County, and shall be payable out of the County Treasury on the warrant of the Probate Judge.

Section 11. Each member of the Board elected or appointed from the several Districts is hereby required before entering upon the duties of his office to make and file with the Judge of Probate of the County an oath of office and bond in the penal sum of $3,000.00, or in such other sum as may be required of County Commissioners or members of County Boards of Revenue now or hereafter by the general laws of Alabama, payable to Hale County with sufficient sureties to be approved by the Probate Judge of the County. Said bonds shall be conditioned as now or as may be hereafter provided by the general laws of Alabama with respect to County Commissioners or members of Boards of Revenue or other like bodies, and the premiums therefor shall be paid from the County Treasury.

Section 12. The Board shall require the County Engineer to execute a bond, with surety to be approved by the Board, payable to Hale County in a penal sum of

not less than $5,000.00 for the faithful accounting for all moneys or property of said county which may come into his hands as such County Engineer, and with such other conditions as the Board might reasonably require. The premiums for such bond shall be paid from the County Treasury.

Section 13. Any vacancy in the office of a member of the Board elected or appointed from either of the four Districts of the County shall be filled by appointment of the Governor for the unexpired term.

Section 14. All General Laws of Alabama now in force or hereafter enacted which apply to Courts of County Commissioners or County Boards of Revenue, or to the members thereof, shall apply to and govern the Board of Revenue of Hale County and the members thereof, except in so far as the same are or may be in conflict or inconsistent with this Act.

Section 15. Should any Section, paragraph, portion or provision of this Act be declared unconstitutional or void for any reason, it shall not affect the validity of the remaining paragraphs, provisions, portions or sections of this Act.

Section 16. That all laws and parts of laws, general, local or special, in conflict with the provisions of this Act, are hereby repealed, insofar as they conflict with the provisions of this Act.

Section 17. This Act shall take effect immediately upon its passage and approval by the Governor.

Approved June 3, 1953.

Time: 2:45 P.M.

## APPENDIX C

### Act No. 370 H. 838–Avery

### AN ACT

To amend Section 2 of an act approved June 3, 1953, establishing a board of revenue for Hale County (Act No. 61, H. 209, Acts of Alabama 1953, Vol. I, p. 89) so as to provide for the election of members of the board of revenue by districts.

Be It Enacted by the Legislature of Alabama:

Section 1. Section 2 of an act approved June 3, 1953, establishing a board of revenue for Hale County (Act No. 61, H. 209, Acts of Alabama 1953, Vol. I, p. 89) is hereby amended to read as follows:

"Section 2. That for the purpose of this Act and the enforcement thereof the said County of Hale shall be divided into Four subdivisions, to be known as Districts, and numbered respectively from one to four, both inclusive. District No. 1 shall embrace and be composed of beats or precincts numbered 1, 2, 12 and 16 as now constituted or as the same may be hereafter changed in boundaries according to law. District No. 2 shall embrace and be composed of beats or precincts numbered 6, 7, 8 and 9 as now constituted or as the same may be hereafter changed in boundaries according to law. District No. 3 shall embrace and be composed of beats or precincts numbered 4 and 5 as now constituted or as the same may be hereafter changed in boundaries according to law. District No. 4 shall embrace and be composed of beats or precincts numbered 3, 10, 11, 13, 14 and 18 as now constituted or as the same may be hereafter changed in boundaries according to law. The incumbent members of the board shall continue in office until the expiration of the term for which they were elected. Succeeding members of the board from Districts No. 1 and No. 4 shall hold office for four years from the first Monday after the second Tuesday in January, 1963, and until their successors are elected and qualified, such election to be at the regular November election in 1962, and every four years thereafter. The succeeding members of said board from Districts No. 2 and No. 3 shall hold office for four years from the first Monday after the second Tuesday in January, 1961, and until their successors are elected and qualified, such election to be held at the regular November election in 1960, and every four years thereafter. Each member of the board from a district of the county shall be elected by the quali-

▉▉▉▉▉▉▉

fied electors of the district, it being intended that two members of the board from districts in the county shall be elected every two years, commencing with the regular November election of 1960, each to be elected for a term of four years from the first Monday after the second Tuesday in January next after his election, and that each such member of the board shall be elected by the qualified electors of his district. The members of the board from each of the several districts of the county shall be at the time of their appointment or election of the age of twenty–five years or over, and, in addition, each shall be a qualified elector of and reside in the district for which he is elected, both at the time of his election and during his continuance in office."

Section 2. The provisions of this Act shall become effective only if approved by a majority of the qualified electors of Hale County who vote in a referendum election to be held thereon, such election to be held on the same date as the first countywide election held after the passage of this Act. The board of revenue of Hale County shall order and provide for the holding of the referendum on such date. On the ballots to be used at the referendum the question shall be stated substantially as follows: "Shall the provisions of Act No. _____ enacted at the 1959 regular session of the Legislature, which change the method of electing members of the board of revenue of Hale County, be adopted? Yes ( ) No ( )." If a majority of the votes cast at the referendum are "Yes" all the provisions of this Act shall become effective immediately. If the majority vote "No" this Act shall have no further force or effect. The judge of probate of Hale County shall certify the results of the referendum to the secretary of state within thirty days after the returns of the election have been canvassed.

Approved November 6, 1959.

Time: 3:33 P.M.

## APPENDIX D
### Act No. 320 H. 764–Avery

### AN ACT

To amend Section 2 of an act approved June 3, 1953, establishing a board of revenue for Hale County (Act No. 61, H. 209, Acts of Alabama 1953, Vol. I, p. 89) so as to provide for the election of members of the board of revenue by districts.

*Be It Enacted by the Legislature of Alabama:*

Section 1. Section 2 of an act approved June 3, 1953, establishing a board of revenue for Hale County (Act No. 61, H. 209, Acts of Alabama 1953, Vol. I, p. 89), as amended, is hereby amended further to read as follows:

"Section 2. That for the purpose of this Act and the enforcement thereof the said County of Hale shall be divided into Four subdivisions, to be known as Districts, and numbered respectively, from one to four, both inclusive. District No. 1 shall embrace and be composed of beats or precincts numbered 1, 2, 12 and 16 as now constituted or as the same may be hereafter changed in boundaries according to law. District No. 2 shall embrace and be composed of beats or precincts numbered 6, 7, 8 and 9 as now constituted or as the same may be hereafter changed in boundaries according to law. District No. 3 shall embrace and be composed of beats or precincts numbered 4 and 5 as now constituted or as the same may be hereafter changed in boundaries according to law. District No. 4 shall embrace and be composed of beats or precincts numbered 3, 10, 11, 13, 14 and 18 as now constituted or as the same may be hereafter changed in boundaries according to law. The incumbent members of the board shall continue in office until the expiration of the term for which they were elected. Succeeding members of the board from Districts No. 1 and No. 4 shall hold office for four years from the first Monday after the second Tuesday in January, 1967, and until their successors are elected and qualified, such election to

be at the regular November election in 1966, and every four years thereafter. The succeeding members of said board from Districts No. 2 and No. 3 shall hold office for four years from the first Monday after the second Tuesday in January, 1969, and until their successors are elected and qualified, such election to be held at the regular November election in 1968, and every four years thereafter. Each member of the board from a district of the county shall be elected by the qualified electors of the entire county, it being intended that two members of the board from districts in the county shall be elected every two years, commencing with the regular November election of 1966, each to be elected for a term of four years from the first Monday after the second Tuesday in January next after his election, and that each such member of the board shall be elected by the qualified electors of the entire county. The members of the board from each of the several districts of the county shall be at the time of their appointment or election of the age of twenty–five years or over, and, in addition, each shall be a qualified elector of and reside in the district for which he is elected, both at the time of his election and during his continuance in office. Provided, however, that should the term of office of the members of the Board of Revenue or County Commission be extended by state–wide law to a term of six years, the provisions of this act as to qualification and a countywide election would still be in force, with members from Districts No. 1 and No. 4 being elected in the same election year, the members from Districts No. 2 and 3, in the election year two years later, and thus in successive terms of six · years each."

Section 2. The provisions of this Act shall become effective only if approved by a majority of the qualified electors of Hale County who vote in a referendum election to be held thereon, such election to be held on the same date as the first countywide election held after the passage of this Act. The board of revenue of Hale County shall order and provide for the holding of the referendum on such date. On the ballots to be used at the referendum the question shall be stated substantially as follows: "Shall the provisions of Act No. _____ enacted at the 1965 Regular Session of the Legislature, which change the method of electing members of the board of revenue of Hale County, be adopted? Yes ( ) No ( )." If a majority of the votes cast at the referendum are "Yes" all the provisions of this Act shall become effective immediately. If the majority vote "No" this Act shall have no further force or effect. The judge of probate of Hale County shall certify the results of the referendum to the secretary of state within thirty days after the returns of the election have been canvassed.

Approved August 10, 1965.
Time: 5:22 P.M.

## APPENDIX E

Act No. 2022 H. 2507–Owens

### AN ACT

Relating to counties having a population of not less than 15,650, nor more than 16,200, according to the most recent federal decennial census; providing for the election of the associate members of the county governing body.

*Be It Enacted by the Legislature of Alabama:*

Section 1. In all counties having a population of not less than 15,650, nor more that 16,200 according to the most recent federal decennial census, the associate members of the County Commission, Board of Revenue or other like governing bodies of such county, shall be elected by the qualified electors of the county at large, and are not required to be residents of any district within the county. Members of the governing body in place number two and place number three shall be elected at the general election held in 1972, and shall serve four years from the first Monday after the second Tuesday in

January next following their election. Members in place number one and place number four shall be elected at the general election held in 1974 and shall serve four years from the first Monday after the second Tuesday in January next following their election. Each member shall be a qualified elector of the county. Incumbents in the respective places on the governing body shall serve until their successors are elected and qualified as provided herein.

Section 2. All laws or parts of laws which conflict with this act are repealed.

Section 3. This act shall become effective immediately upon its passage and approval by the Governor, or upon its otherwise becoming a law.

Approved September 20, 1971.
Time: 1:39 P.M.

## APPENDIX F
### Act No. 620 H. 1717–Owens

### AN ACT

Relating to Hale County; providing for the election of the associate members of the county governing body.

*Be It Enacted by the Legislature of Alabama:*

Section 1. In Hale County the associate members of the county commission, Board of Revenue or other like governing bodies of such county, shall reside in and be a qualified elector of the district he represents but all such members shall be elected by the qualified electors of the county.

Section 2. The county shall remain in four districts numbered one through four. District No. 1 shall be composed of beats 2, 12, 16, and all of beat 1 lying west of Alabama State Highway 69. District No. 2 shall be composed of beat 6 and all of beat 4, from the north beat 4 boundary line, lying west of Alabama State Highway 69 south to Hale County Highway 24, and all of beat 4 lying north of Hale County Highway 24, to the west boundary line of beat 4. District 3 shall be composed of beats 5, 7, 8, 9, all of beat 4 lying west of Alabama State Highway 61 south from the intersection of Alabama State Highway 14, all of beat 4 lying south of Alabama State Highway 14 from the intersection of Alabama State Highway 69 to Alabama State Highway 61, all of beat 4 lying east of Alabama State Highway 69 south of the intersection of State Highway 14 down to Hale County Highway 24, then all of beat 4 lying south of Hale County Highway 24. District 4 shall be composed of beats 3, 10, 11, 13, all of beat 1 lying east of Alabama State Highway 69, all of beat 4 lying east of Alabama State Highway 61 south from the intersection of Alabama State Highway 14, all of beat 4 lying north of Alabama State Highway 14 east to Alabama State Highway 61, from the intersection of Alabama State Highway 69, all of beat 4 lying east of Alabama State Highway 69 from the north beat 4 boundary line south to the intersection of Alabama State Highway 14. The word "beats" as used herein means the election beats or precincts into which the county is divided pursuant to law on the date on which this act becomes law.

Section 3. The members shall be elected for overlapping terms. Clifton Abernathy, Jr. shall serve district 1, Harry W. Drake shall serve district 2, Goldsby Tucker shall serve district 3, and John B. Stokes shall serve district 4. Members of the governing body in districts 2 and 3 shall be elected at the general election held in 1976. Members of district one and four shall be elected at the general election held in 1974; each member shall take office on the first Monday after the second Tuesday in January next following their election. All members of the governing body shall serve for four year terms.

Section 4. All laws or parts of laws which conflict with this act are repealed.

Section 5. This act shall become effective immediately upon its passage and approval by the Governor, or upon its otherwise becoming a law.

Approved August 27, 1973.
Time: 5:35 P.M.

APPENDIX G

112

Act No. 98 S.J.R. 12–Givhan

## SENATE JOINT RESOLUTION

WHEREAS legislation has been proposed and, with the support of the President, is expected to be introduced in the United States Congress within the next few days for the purpose of providing federal registrars in the South to enroll negro voters; and

WHEREAS great strides have been made in Alabama, and are continuing to be made, to enroll all qualified voters regardless of race, which policy is fair, just, and equitable. In contrast, Martin Luther King and his so–called "Improvement Society" together with outside agitators, communist sympathizers, and well meaning, but socially ignorant crusaders, have skillfully laid the ground work for such a vicious piece of legislation by stirring up strife and dissension in this area in particular and throughout this country generally; and

WHEREAS to provide federal registrars in any state would serve but to strip the local officials, who are best able to judge a voter's qualifications, of all power, authority, and duty, and to reduce such state to a mere geographic non–entity; and

WHEREAS the policy of registering persons of limited education and little or no qualifications would not only nullify efforts made in behalf of better race relations, but would lead to many serious problems which might well be the beginning of another period of reconstruction resulting in a national tragedy; now therefore

BE IT RESOLVED BY THE LEGISLATURE OF ALABAMA, BOTH HOUSES THEREOF CONCURRING, That this body respectfully requests each member of Alabama's delegation in the United States Congress to use every effort and all means available to prevent this vicious proposal from being presented to Congress, and to redouble their efforts to defeat it if it is so introduced.

BE IT FURTHER RESOLVED That copies of this resolution be sent to Senators Hill and Sparkman and to Representatives George Andrews, Glenn Andrews, John Buchanan, W. L. Dickinson, Jack Edwards, R. E. Jones, Jim Martin, and Armistead Selden, Jr.

Approved March 22, 1965.

Time: 3:59 P.M.